IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 13, 2002

**STATE OF TENNESSEE v. IVAN E. CUMMINGS**

**Appeal from the Circuit Court for Montgomery County**
**No. 41083A      Robert W. Wedemeyer, Judge**

**No. M2001-00407-CCA-R3-CD - September 5, 2002**

The defendant, Ivan E. Cummings, pled guilty in the Montgomery County Circuit Court to aggravated child abuse, aggravated child neglect, and second degree murder, Class A felonies. The trial court merged the aggravated child abuse and neglect convictions and sentenced the defendant as a Range I, standard offender to twenty-four years in the Tennessee Department of Correction. For the second degree murder conviction, the trial court sentenced the defendant to twenty-five years to be served concurrently with the twenty-four-year sentence. The defendant appeals, claiming that the trial court erroneously applied enhancement factors to his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Roger Eric Nell, District Public Defender, and Collier W. Goodlett, Assistant District Public Defender, for the appellant, Ivan E. Cummings.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and C. Daniel Brollier, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the death of the defendant's five-year-old daughter. At the sentencing hearing, Detective Cheryl Anderson of the Clarksville Police Department testified that on October 13, 1998, she was assigned to investigate the victim's death and went to Gateway Hospital, where she met the defendant and his wife, Tara Cummings. At that time, Detective Anderson did not question the defendant about what had happened to the victim. Later, the defendant told Detective Anderson the following: On Monday, October 12, the defendant had taken the victim to school in order to have the victim apologize to the victim's teacher for receiving a bad progress report the

previous Friday. On Monday evening, the victim brought home another bad progress report from school. The defendant got home from work about 7:00 p.m. and spanked the victim about 9:00 p.m. To administer the spanking, the defendant had the victim take off her clothes and bend over the bed. The defendant then hit the victim's buttocks with a belt about twenty times. During the twenty-minute spanking, the victim tried to get away from the defendant, fell against a dresser, and fell backward onto the floor. About 2:00 a.m., the defendant checked on the victim and found her unresponsive. Although Tara Cummings had been in the bedroom during the spanking, the defendant took full responsibility for spanking the victim.

Detective Anderson was present during the victim's autopsy and identified photographs showing bruises on the victim's upper legs, torso, back, chest, and left side of the face. The victim also had bite marks on her arms. When Detective Anderson asked the defendant about the bite marks, he told her he did not know anything about them. The defendant did not express surprise or concern about the bruises on the victim's body.

On cross-examination, Detective Anderson acknowledged taking a statement from the defendant's neighbor, Tara Brown. In the statement, Ms. Brown said that on Friday, October 9, the victim spent part of the afternoon at Ms. Brown's house. Tara Cummings came to get the victim and asked to see the victim's progress report. Upon seeing the report, Mrs. Cummings told the victim, "You're going to get it" and took the victim home. Detective Anderson also acknowledged taking a statement from a woman named Arnetta Holmes. In that statement, Ms. Holmes said Tara Cummings was the dominant person in the Cummings's marriage and that Mrs. Cummings whipped the victim. Ms. Holmes's statement also described an incident in which the victim and Mrs. Cummings were visiting her home. Mrs. Cummings got mad at the victim and took the victim into Ms. Holmes's bathroom. Ms. Holmes then heard a lot of thumping "like someone was fist fighting or something." When Ms. Holmes opened the bathroom door, she saw the victim crying and Mrs. Cummings "huffing." According to the statement, the only person Ms. Holmes knew to have hit the victim was Mrs. Cummings.

Tara Cummings told Detective Anderson that she bit the victim on Friday, October 9. According to the detective, the defendant was not present when Mrs. Cummings bit the victim. When Detective Anderson talked to Dr. Charles Harlan, who performed the victim's autopsy, he told her the victim's injuries were inconsistent with the defendant's explanation for her death.

Detective Robert Miller of the Clarksville Police Department testified that on October 13, 1998, he went to the Cummings's apartment to take photographs. On the dresser in the master bedroom, he found two disciplinary notes that the victim had brought home from school.

Maxine Egleston, the victim's paternal grandmother, testified that the victim came to live with her when the victim was five months old. The victim lived with her for three and one-half years and then went to live with the defendant and the victim's stepmother, Tara Cummings. On October 12, 1998, Ms. Egleston spoke with the victim twice on the telephone. Ms. Egleston first spoke with the victim about 6:00 p.m., and the victim was crying, sounded frightened, and had slurred speech.

Tara Cummings had the telephone speaker on and when Ms. Egleston asked the victim if Mrs. Cummings had hit her, she heard Mrs. Cummings say to the victim, "[Tell] her no. Tell her I haven't touched you, your Dad is going to whip you when he gets here."

About 7:00 p.m., Ms. Egleston decided to telephone her son at work in order to tell him to go home and check on the victim. However, a man answered and told her that Tara Cummings had already telephoned the defendant and had asked him to come home. Thirty minutes later, Ms. Egleston spoke with the defendant and asked him not to spank the victim. Mrs. Cummings was yelling in the background, and the defendant was upset that the victim had gotten in trouble again at school. However, the defendant promised Ms. Egleston that he would not spank the victim and that he would let the victim go to bed. The defendant put the victim on the telephone, and Ms. Egleston asked the victim if she was alright. The victim said yes. Early the next morning, the defendant telephoned Ms. Egleston and told her that there had been an accident and that the victim was dead.

The defendant never explained to Ms. Egleston what happened to the victim. Ms. Egleston believed that the defendant whipped the victim on October 12 and that he felt guilty for the victim's death because he knew Tara Cummings was abusing the victim and did nothing to stop it. Ms. Egleston thought the defendant would lie for Mrs. Cummings.

Deborah Moore, the victim's mother, testified that she talked to Tara Cummings and the victim on the telephone on the night of October 12 and that Tara Cummings told Ms. Moore the victim was in trouble. When the victim got on the telephone, she sounded like she was afraid to talk to her mother, and Ms. Moore could hear Mrs. Cummings yelling at the victim. About an hour later, the defendant telephoned Ms. Moore and told her that the victim had been bad at school. He did not say what he was going to do to the victim. On cross-examination, Ms. Moore testified that she could not tell if the victim was talking to her on a speaker phone. However, she thought it likely that Mrs. Cummings heard her conversation with the victim.

The state introduced a copy of the victim's autopsy report into evidence. According to the report, the victim died of blunt trauma to the head. The report also stated that the victim had concurrent blunt trauma to the abdomen that produced mesenteric injury and bleeding. Dr. Harlan noted extensive cutaneous injuries and scars on the victim's body. A chart attached to the report shows bite marks, scars, scabs, and bruises on the victim's body from head to toe.

The defense read to the trial court notes that the prosecutor had written after a conversation he had with the Nashville Medical Examiner about the victim's case. According to the notes, the medical examiner agreed with Dr. Harlan's finding that the victim suffered abdominal injuries, and he thought the victim's abdominal injury would have required a significant blow to the stomach. The medical examiner believed that the stomach injury occurred six to twelve hours before the victim's death and that the head injury occurred four to six hours before death. The medical examiner did not think that the victim's injuries could have occurred by falling onto a dresser. The medical examiner said there were healed and healing injuries on the victim and believed that she had

been abused over a period of time. He told the prosecutor that most of the victim's bruises appeared fairly fresh and that x-rays indicated the victim had suffered possible twisting or yanking injuries.

The state introduced the defendant's presentence report into evidence. According to the report, the then thirty-year-old defendant was a high school graduate and had one other daughter. He reported being in good physical health. He did not use alcohol or illegal drugs, and he had been married to Tara Cummings for five years. In the report, the defendant stated that he had a loving and supportive family. The report shows that the defendant spent eight years in the United States Army and that at the time of the victim's death, he had been working for almost two years as an account manager with Rent-a-Center. The report reflects that the defendant had a prior conviction for a traffic offense. The state also introduced into evidence a certified copy of a judgment showing that the defendant had been convicted in Ohio of assault.

In sentencing the defendant, the trial court noted that as a Range I, standard offender, the defendant's presumptive sentence for each conviction was twenty years, the midpoint in the range for a Class A felony. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court found the following enhancement factors applicable to both convictions pursuant to Tenn. Code Ann. § 40-35-114: (1) the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range; (5) the defendant treated the victim with exceptional cruelty during the commission of the offense; and (15) the defendant abused a position of private trust. For the second degree murder conviction, the trial court also applied enhancement factor (4), that the victim was particularly vulnerable because of her age or physical or mental disability. See Tenn. Code Ann 40-35-114. In mitigation, the trial court considered that the defendant had accepted responsibility for the crimes. See Tenn. Code Ann. § 40-35-113(13). For the aggravated child abuse/neglect conviction, the trial court enhanced the defendant's sentence to twenty-five years and reduced it by one year for the mitigation factor. For the second degree murder conviction, the trial court found that the four enhancement factors outweighed the mitigation factor and sentenced the defendant to twenty-five years. The trial court ordered that the defendant serve his sentences concurrently.

When a defendant appeals the length, range, or manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

Initially, we note that any evidence presented at the guilty plea hearing should be considered in determining the appropriate sentence. See Tenn. Code Ann.§ 40-35-210(b)(1). However, the defendant has failed to include in the record on appeal a transcript of the guilty plea hearing relating to his conviction. It is the duty of the defendant to prepare a fair, accurate, and complete record on

appeal to enable meaningful appellate review. T.R.A.P. 24. This court has repeatedly held that failure to include the transcript of the guilty plea hearing in the record prohibits the court's conducting a meaningful de novo review of the sentence. Absent the guilty plea hearing, in which facts are presented, we may presume that the trial court was justified in applying the enhancement and mitigating factors. See, e.g., State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). In any event, the record before us supports the trial court's determination.

The defendant claims that the evidence fails to support the trial court's application of enhancement factor (5), that he treated the victim with exceptional cruelty during the commission of the offense. We disagree. The application of factor (5) requires "exceptional cruelty," which is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). Our supreme court has held that the facts must support a finding of "'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). In other words, proper application of this factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001).

The medical examiner reported numerous bruises that were fairly fresh, as well as healed injuries, indicating abuse over a period of time. The victim's autopsy report shows that she died of blunt trauma to the head and that she suffered relatively concurrent blunt trauma to the abdomen with sufficient force to cause internal injuries and bleeding. Given the injuries to the five-year-old victim, especially the blow to the stomach, we cannot conclude that the evidence preponderates against the trial court's application of the exceptional cruelty factor to enhance the murder sentence. As to the trial court's application of factor (5) to the aggravated child abuse/neglect sentence, without the guilty plea facts, we can only assume that the defendant's guilty plea to aggravated child neglect resulted from his failure to protect the victim from Tara Cummings's abuse and that he is liable for Mrs. Cummings's actions. The autopsy report shows that the victim had bruises and scars all over her body and bite marks on her left thigh and right arm. The record justifies the trial court's application of factor (5) to enhance the defendant's aggravated child abuse/neglect sentence.

Next, the defendant claims that the trial court improperly applied enhancement factor (15), that the defendant abused a position private trust. Although the defendant's brief makes no argument as to why the factor is inapplicable, the defendant cites to State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996), which states that

> application of the factor requires a finding, first, that defendant occupied a position of trust, either public or private. The position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to

the victim that promoted confidence, reliability, or faith. If the evidence supports that finding, then the court must determine whether the position occupied was abused by the commission of the offense. Ordinarily, only the first question will pose a difficulty for the court.

The defendant, as the victim's father, abused a position of private trust when he killed the victim and repeatedly allowed Tara Cummings to physically abuse her. The trial court properly applied enhancement factor (15).

Finally, the defendant claims that the trial court erred by applying factor (4), that the victim was particularly vulnerable, to enhance his sentence for second degree murder. He contends that this factor does not apply because "there was no proof at the sentencing hearing that the vulnerability of the victim of this crime was a factor in the commission of the offense." He contends that the mere fact that the victim was five years old does not establish her vulnerability. Even if the defendant's argument is true, it would not change the result in this case. The application of the other three enhancement factors to the defendant's second degree murder sentence justifies his twenty-five-year sentence. We conclude that the defendant has failed to demonstrate that the trial court's sentences are erroneous.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE